**[J-62-2020][M.O. - Wecht, J.]**

**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| THE HONORABLE TOM WOLF, GOVERNOR OF THE COMMONWEALTH OF PENNSYLVANIA, | : | No. 104 MM 2020 |
| | : | |
| | : | SUBMITTED:  July 1, 2020 |
| Petitioner | : | |
| | : | |
| v. | : | |
| | : | |
| SENATOR JOSEPH B. SCARNATI, III, SENATOR JAKE CORMAN, AND SENATE REPUBLICAN CAUCUS, | : | |
| | : | |
| Respondents | : | |

**DISSENTING OPINION**

**CHIEF JUSTICE SAYLOR**                    **DECIDED:  July 1, 2020**

In his prayer for relief, the Governor has asked this Court only to declare that Article III, Section 9 of the Pennsylvania Constitution renders the General Assembly's concurrent resolution requiring the termination of the renewed disaster emergency a legal nullity.  *See, e.g.*, Application for the Court to Exercise Jurisdiction in *Wolf v. Scarnati*, 104 MM 2020 (Pa.), at 32.  In this regard, the chief executive – as the petitioner – has avoided the question of what the Legislature intended when it prescribed, in Section 7301(c) of the Emergency Management Services Act, that the General Assembly, by concurrent resolution, may terminate a disaster emergency at any time.  *See* 35 Pa.C.S. §7301(c).

I have no objection to the majority's decision to consider the legislative intent underlying Section 7301(c), albeit that I differ with its reasoning and conclusion. In this regard, I also find that the narrow set of issues upon which the Governor wishes to focus cannot be wholly disentangled from the wider array of statutory and doctrinal considerations in play, particularly the overarching separation of powers concerns. *Cf. Kelly v. Legislative Coordinating Council*, 460 P.3d 832, 841 (Kan. 2020) (Stegall, J., concurring) (alluding to the "vexing separation of powers problems created when one branch of government delegates its power to another branch as the Legislature has done (in part)" in the Kansas Emergency Management Act, and opining that "[a]bsent a liberal interpretation of the Legislature's ability to continually oversee the Governor's exercise of delegated Legislative authority, the structure of [the Kansas Emergency Management Act] itself risks violating the constitutional demand of separate powers").

This dispute arises from the General Assembly's decision, consistent with that of many other state legislatures, that the chief executive is the most logical and efficacious first responder to emergencies affecting the public at large. Given both institutional constraints impacting legislative action and the Legislature's inability, as of the time of the enactment of the Emergency Management Services Code, to predict the character and timing of emergent circumstances as they might arise in the future, it delegated to the Governor the power to discern and declare an emergency. Correspondingly, it conferred upon the chief executive an extraordinary set of powers – including the authority to suspend laws and to commandeer private property if necessary – as essential countermeasures.[1] At the same time, the General Assembly quite rationally

---

[1] As the majority explains, the power to suspend laws is commended to the General Assembly in the Pennsylvania Constitution's Declaration of Rights. *See* PA. CONST. art. I, §12 ("No power of suspending laws shall be exercised unless by the Legislature or by its authority.").

reserved to itself the ability to make its own assessment of whether the circumstances at hand rise to a disaster emergency and to override the Governor's declaration of an emergency upon the passage of a concurrent resolution. *See* 35 Pa.C.S. §7301(c).

As the majority relates, facially Article III, Section 9 of the Pennsylvania Constitution suggests that all concurrent resolutions, *i.e.*, resolutions "to which the concurrence of both Houses may be necessary," PA. CONST. art. III, §9, "shall be presented to the Governor" and are subject to a veto power on his part. *See id.* According to this Court's longstanding precedent, however, Article III, Section 9 is only applicable to resolutions that "relate to and are a part of the business of legislation." *See, e.g.*, *Commonwealth ex rel. Attorney General v. Griest*, 196 Pa. 396, 409, 46 A. 505, 508 (1900). The parties agree, at least in some passages in their submissions, that the question in this case distills to whether the concurrent resolution at hand satisfies this criterion. *See, e.g.*, Application for the Court to Exercise Jurisdiction in *Wolf v. Scarnati*, 104 MM 2020 (Pa.), at 21 ("[O]nly resolutions that 'make legislation *or have the effect of legislating*' must be so submitted [to the Governor]" (emphasis in original)); Brief for Petitioners in Support of Application for Expedited Summary Relief in *Scarnati v. Wolf*, 344 M.D. 2020 (Pa. Cmwlth.), at 20.

The relevant terms of Section 7301(c) comprise, in effect, a legislative veto relative to a sweeping delegation of legislative power, which in my view does not bear the essential relationship to conventional legislation such as would have been within the framers' contemplation.[2] In this regard, I simply cannot envision that the framers of the

---

[2] This is not to say that a legislative veto of the Governor's emergency declaration does not raise independent separation-of-powers concerns. *See, e.g.*, *INS v. Chadha*, 462 U.S. 919, 959, 103 S. Ct. 2764, 2788 (1983) (holding that a unicameral Congressional veto power over determinations to suspend deportations of discrete individuals violated the separation-of-powers doctrine). In this instance, however, as further developed below, I am of the view that the breadth of the essential delegation of emergency (continued…)

Pennsylvania Constitution contemplated that the Governor could be invested with a panoply of exceptional powers – including the delegated power to suspend laws and commandeer private property – but that the Legislature nonetheless would be powerless to implement a counterbalance that was not then subject to the chief executive's own veto power.  In this respect, it is my considered judgment that the emergency-powers paradigm is essentially *sui generis*.

According to the majority, the 1987 decision in *Commonwealth v. Sessoms*, 516 Pa. 365, 532 A.2d 775 (1987), adopted *Chadha v. INS*, 462 U.S. 919, 103 S. Ct. 2764 (1983), which contained broad language disapproving legislative vetoes in the abstract based upon separation-of-powers principles.  *See id.* at 958-59, 103 S. Ct. at 2788. *Sessoms*, however, left the *Chadha*-related questions "largely unresolved," since the Court ultimately applied a plain-meaning interpretation of Article III, Section 9. *Sessoms*, 516 Pa. at 378-79, 532 A.2d at 781-82.[3]

---

(…continued)
powers to the executive in light of future and unforeseen circumstances justifies an equally extraordinary veto power in the Legislature.  *Cf. Communications Workers of Am., AFL-CIO v. Florio*, 617 A.2d 223, 232-33 (N.J. 1992) ("Where legislative action is necessary to further a statutory scheme requiring cooperation between the [legislative and executive] branches, and such action offers no substantial potential to interfere with exclusive executive functions or alter the statute's purposes, legislative veto power can pass constitutional muster." (citation omitted)); Reply Brief for Respondents at 1 (positing that, under Pennsylvania's Emergency Management Services Code, the Governor is to govern "in partnership with the legislature").

[3] Notably, the *Sessoms* Court failed to recognize the exception to the presentment requirement, deriving from the *Griest* decision, for matters that do not concern the business of legislating.  *See Sessoms*, 516 Pa. at 379-80, 532 A.2d at 781-82.  This omission seems materially problematic, since the Court otherwise announced that the Legislature's prescription for commission-created sentencing guidelines had "done no more than direct that the courts take notice of the Commission's work" and "[o]nly in this limited way" could the guidelines "be given effect beyond the confines of the General (continued…)

The majority otherwise acknowledges what this Court has stated many times, namely, that "every case, and every statute, must be evaluated independently." Majority Opinion, *slip op.* at 24; *accord, e.g.*, *Oliver v. City of Pittsburgh*, 608 Pa. 386, 395, 11 A.3d 960, 966 (2011) (explaining that the holding of a judicial decision is read against its facts). As related by Chief Justice John Marshall:

> It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the Court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.

*Cohens v. State of Virginia*, 19 U.S. 264, 399-400 (1821).

Consistent with this principle, to the degree *Sessoms* can be read to suggest an adherence to *Chadha* in its broadest construction, I do not regard the case as binding precedent in the present – and very different – context. Moreover, the criticisms of *Chadha*'s wide-ranging pronouncements disapproving legislative vetoes in the abstract are legion. *See, e.g.*, Philip P. Frickey, *The Constitutionality of Legislative Committee Suspension of Administrative Rules: The Case of Minnesota*, 70 MINN. L. REV. 1237, 1250 n.63 (1986) (collecting articles).

I believe that the present context presents a compelling case that legislative vetoes should not be regarded as being *per se* violative of separation-of-powers

---

(…continued)
Assembly[.]" *Id.* at 377, 532 A.2d at 781. In this regard and otherwise, *Sessoms* was incompletely reasoned.

principles. Rather, I would follow the lead of the New Jersey Supreme Court by recognizing that, "[w]here legislative action is necessary to further a statutory scheme requiring cooperation between the [legislative and executive] branches, and such action offers no substantial potential to interfere with exclusive executive functions or alter the statute's purposes, legislative veto power can pass constitutional muster." *Enorato v. N.J. Bldg. Auth.*, 448 A.2d 449, 451 (N.J. 1982) (quoting *General Assembly v. Byrne*, 448 A.2d 438, 448 (N.J. 1982)). And I can think of no more appropriate setting for the contemplated inter-branch cooperation and power-sharing to be intelligently and properly exercised than in the management of a disaster emergency.

For the above reasons, I would find that Article III, Section 9 does not apply to the concurrent resolution requiring the termination of the disaster emergency as renewed by the Governor, and such concurrent resolution does not offend the separation-of-powers doctrine. And, accordingly, I cannot agree with the majority's premise that the principle of constitutional avoidance supplies a reason to impose a construction on Section 7301(c), which, in any event, is inconsistent with the statute's plain language and apparent purposes.

In this regard, the Legislature knows well how to prescribe for presentment to the Governor in statutes. *See, e.g.*, Brief for Petitioners in Support of Application for Expedited Summary Relief in *Scarnati v. Wolf*, 344 M.D. 2020 (Pa. Cmwlth.), at 21 (citing 71 P.S. §745.7(d), 53 P.S. §42206(b)(1), 53 P.S. §28206(b), and 53 P.S. §12720.206(b)). Moreover, Section 7301(c) – which requires that the Governor *shall* issue an executive order terminating a disaster emergency *thereupon* after the issuance of a concurrent resolution – leaves no room for an intervening gubernatorial veto.[4] It

---

[4] The majority posits that, under Section 7301(c), a state of disaster emergency ends "only after the Governor so finds." Majority Opinion, *slip op.* at 25. But under the concurrent resolution provision of the statute, the Governor's mandatory obligation to (continued…)

also seems to me to be quite unlikely that the Legislature would have conferred such a broad delegation of emergency powers upon the Governor while apprehending that the contemplated legislative oversight was subordinate to a gubernatorial veto, thus affording the executive the ability to require a supermajority vote. *Accord* Reply Brief for Respondents at 15 ("[C]ommon sense and experience dictate that each branch of government seeks to protect its institutional powers to the greatest degree practicable.").[5]

_____

(…continued)
issue an executive order or proclamation ending an emergency is triggered "thereupon" after the General Assembly's issuance of such a resolution. 35 Pa.C.S. §7301(c). For these reasons, I also find unpersuasive the majority's position that the mere ministerial involvement of the Governor in this latter process implies presentment under Article III, Section 9. *See* Majority Opinion, *slip op.* at 20.

Ultimately, I believe my difference with the majority's analysis on this point stems from my understanding that the statute provides for two distinct ways a disaster emergency can end: one initiated by the Governor, *see* 35 Pa.C.S. §7301(c) ("The state of disaster emergency shall continue until the Governor finds that the threat or danger has passed . . .."), and the other initiated by the Legislature, *see id.* ("The General Assembly by concurrent resolution may terminate a state of disaster emergency at any time.").

Thus, I respectfully disagree with the concept that, to "afford meaning to all of the provisions of the statute," the Governor's input must sought via presentment when the Legislature initiates the termination. Majority Opinion, *slip op.* at 25.

[5] I view the majority's decision to imply a presentment requirement into the statute as being in tension with the rule that courts are not at liberty to insert words into statutory provisions that the legislative body has not included. *See, e.g.*, *Burke v. Independence Blue Cross*, 628 Pa. 147, 159, 103 A.3d 1267, 1274 (2014). As noted above, when the Legislature has chosen to require presentment, it has said so. *See, e.g.*, 71 P.S. §745.7(d) ("If the General Assembly adopts the concurrent resolution by majority vote in both the Senate and the House of Representatives, the concurrent resolution shall be presented to the Governor . . .."). Thus, its failure to do so here does not appear to be unintentional.

(continued…)

Additionally, given that the concurrent-resolution provision of Section 301(c) plainly serves as an inter-branch check on the Governor's exercise of delegated emergency powers, the question presents itself whether that delegation would comport with constitutional norms if the contemplated oversight is greatly weakened by affording the Governor the ability to require such a supermajority to secure implementation. *See* PA. CONST. art. 2, §1 ("The legislative power of this Commonwealth shall be vested in a General Assembly, which shall consist of a Senate and a House of Representatives."). While I find this issue to reside well beyond the scope of what needs to be, and should be, decided here, I take the opportunity to observe that Respondents present a colorable argument that such dilution renders the entire Emergency Management Services Act unconstitutional.[6]

---

(…continued)
Moreover, while the principle of constitutional avoidance – on which the majority relies, *see* Majority Opinion, *slip op.* at 20 – is an important judicial tool for saving statutes when reasonably possible, the underlying justification is that the construction which avoids grave constitutional difficulties is likely to be faithful to legislative intent, as the legislative body does not intend to violate the Constitution. That underlying justification is diminished where, as here, the chosen construction substantially weakens the Legislature's ability to act as a check on the actions of a co-equal branch. The reason is self-evident: the General Assembly is not likely to seek to weaken its own institutional powers, particularly vis-à-vis those of a separate and co-equal branch of government. And while the majority correctly observes that the Legislature has clarified that it does not intend to violate the Constitution, *see* Majority Opinion, *slip op.* at 23 (citing 1 Pa.C.S. §1922(3)), that precept alone cannot justify the use of constitutional avoidance to reach an interpretation which was not intended by the General Assembly – particularly as the overarching purpose of *all* statutory construction is to give effect to legislative intent. *See* 1 Pa.C.S. §1921(a). *See generally Clark v. Martinez*, 543 U.S. 371, 382, 125 S. Ct. 716, 725 (2005) (noting that constitutional avoidance is "a means of giving effect to congressional intent, not of subverting it").

[6] Respondents argue:

> Any delegation of exclusive constitutional power by the
> General Assembly can only be lawfully done by guiding and

(continued…)

In summary, I would respond to the Governor's petition and request for relief by holding that Article III, Section 9 of the Pennsylvania Constitution does not require presentment of the concurrent resolution in issue here. In closing, I refer to a passage from Justice Powell's concurrence in *Chadha*, in which he stressed that the "boundaries between each branch should be fixed 'according to common sense and the inherent necessities of the governmental co-ordination.'" *Chadha*, 462 U.S. at 962, 103 S. Ct. at 2790 (quoting *J.W. Hampton, Jr. & Co. v. U.S.*, 276 U.S. 394, 406, 48 S. Ct. 348, 351 (1928)).

I agree, and hence, I respectfully dissent.


Justice Mundy joins this dissenting opinion.

---

(…continued)

> restraining the exercise of the delegated power. *See Protz* [*v. WCAB (Derry Area Sch. Dist.*],161 A.3d [827,] 831 [(Pa. 2017)]. If the General Assembly is stripped of its unilateral power to immediately end a state of disaster emergency under Subsection 7301(c), then there is no restraint on the Governor, and he is able to freely and unilaterally exercise powers of the General Assembly, which unlawfully violates basic separation of powers principles.

Reply Brief for Respondents at 16 n.7; *see also id.* at 15-16 ("Without the concurrent resolution provision, the Governor's delegated powers under Section 7301 are virtually limitless and unrestrained, rendering the General Assembly a mere advisory body during emergencies declared the Governor, thereby consolidating both executive and legislative power into a single branch of government.").